# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


WILLIS A. GLANTON AND
KATHY H. GLANTON

  CASE NO:  1:11-CV-00631-WO-LPA

APPELLANTS;

v.

RICHARD M. HUTSON II,
CHAPTER 13 TRUSTEE

APPELLEE.


## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION
## BANKRUPTCY CASE # 10-82315


## BRIEF OF APPELLANTS


Koury L. Hicks
The Law Offices of John T. Orcutt
1738 Hillandale Rd. # D
Durham NC, 27705
khicks@johnorcutt.com
(919)-286-1695 *phone* / (919)-286-2704 *fax*
Attorney for the Appellants,
Willis A Glanton and Kathy H. Glanton
North Carolina State Bar No. 36204

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ii

STATEMENT OF ISSUE PRESENTED ON APPEAL
AND STANDARD OF REVIEW……………………………………………………..1

STATEMENT OF THE CASE .......................................................................................2

STATEMENT OF THE FACTS .....................................................................................5

ARGUMENT ................................................................................................................6

    I.     UNDER A PLAIN LANGUAGE READING OF THE STATUTE,
         UNEMPLOYMENT COMPENSATION SHOULD BE EXCLUDED
         FROM CMI BECAUSE IT FALLS SQUARELY WITHIN THE
         MEANING OF THE TERM "BENEFITS RECEIVED UNDER
         THE  SOCIAL SECURITY ACT"......................................................................6

    II.    THERE IS NO INHERENT AMBIGUITY IN THE LANGUAGE
         OF 11 U.S.C 101(10A)(B), BUT EVEN IF THERE IS AMBIGUITY,
         THERE IS NOTHING TO SUPPORT THE POSITION
         THAT CONGRESS INTENDED FOR UNEMPLOYMENT
         COMPENSATION TO BE INCLUDED IN A CALCULATION OF CMI.....................19

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

## Cases

BFP v. Resolution Trust Corp, 511 U.S. 531 (1994) ....................................................21

Cal. Dep't of Human Res. Dev. V. Java, 402 U.S. 121 (1971)...............................10, 20

City of Chicago v. EDF, 511 U.S. 328 (1994) ...............................................................21

Cooter & Gell v. Hartmax Corp, 496 U.S. 384(1990). ...................................................2

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000) ........6

In re Baden, 396 B.R. 617 (Bankr M.D. Pa. 2008)..............................................passim

In re Compton, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988)............................................24

In re Hickman 104 B.R. 374, 377 (Bankr.D.Colo.1989); ............................................24

In re Kucharz, 418 B.R. 635 (Bankr C.D. Ill. 2009)...........................................8, 13, 14

In re Munger 370 B.R. 21 (Bankr D. Mass. 2007).................................................passim

In re Nance, 2010 WL 2079653 (Bankr S.D. Ind. 2010) ................................................8

In re Overby, 2010 WL 3834647 (Bankr. W.D. Mo. 2010) ...........................................8

In re Overstreet, 23 B.R. 712, 713-715 (Bankr.W.D.La.1982)....................................24

In re Reinertson, 241 B.R. 451, 454 (Bankr. 9th Cir.BAP 1999) ...................................2

In re Rose, 2010 WL 2600591 (Bankr N.D. Ga. 2010) ...........................................8, 20

In re Sorrell, 359 B.R. 167 (Bankr S.D. Ohio 2007)...............................................passim

In re Varat Enter., Inc., 81 F.3d 1310, 1314 (4th Cir. 1996)...........................................2

In re Washington, 438 B.R. 348 (N.D. Ala. 2010).........................................................8

In re Winkles, 2010 WL 2680895 (Bankr. S.D. Ill. 2010)..................................8, 13, 14

Jenkins v. Bowling, 691 F.2d 1225 (7th Cir. 1982)........................................10

Keene Corp.v. United States, 508 U.S. 200 (1993) ........................................22

Local Loan Co. V. Hunt, 292 U.S. 234, 244 (1934) ......................................19

Ransom v. FIA Card Servs. N.A., 131 S. Ct. 716 (2011) ...............................6

Russello v. United States, 464 U.S. 16, 23 (1983)........................................23

Safety-Kleen, Inc. v. Wyche, 274 F.3d 846, 859 (4th Cir. 2001). ...................2

United States v. Ron Pair Enters., Inc. 489 U.S. 235 (1989) .........................6

Williams v. U.S. Fidelity & Guar. Co., 236 U.S. 549 (1915) .......................20

## Statutes

11 U.S.C. § 1325(b)(4)(.......................................................................1, 3, 6

11 U.S.C. § 362(b)(2)...........................................................................21

11 U.S.C. §101(10A)......................................................................passim

11 U.S.C. 109(e)...................................................................................24

11 U.S.C. 1325(b)(3),.............................................................................3

11 U.S.C. 522(d)(10),............................................................................22

11 U.S.C. 704(c)(1)(A)(I).....................................................................21

11 U.S.C. 1325(b)(1)(B)..........................................................................1

42 U.S.C. § 421(a)(1) ...........................................................................17

42 U.S.C. § 1321 ...............................................................................................10, 15

42 U.S.C. § 1321(a)(1) ...............................................................................................11

42 U.S.C. § 1395aa ...............................................................................................18

42 U.S.C. § 503 ...............................................................................................9

42 U.S.C. §1395z ...............................................................................................18

42 U.S.C. 1321(A)(3)(C) ...............................................................................................11

**<u>Social Security Act</u>**

Title I ...............................................................................................17, 18

Title II ...............................................................................................9, 17

Title III ...............................................................................................8, 9, 17, 18

Title IV ...............................................................................................17, 18

Title V ...............................................................................................17, 18

Title VIII ...............................................................................................17

Title IX ...............................................................................................9

Title X ...............................................................................................17, 18

Title XII ...............................................................................................passim

Title XIII ...............................................................................................8

Title XIV ...............................................................................................17, 18

TitleXV…………………………………………………………………………………8

Title XIX ...............................................................................................17, 18

iv

Title XVI ...........................................................................................................17, 18

Title XVIII.....................................................................................................9, 17, 18

Title XX...........................................................................................................17, 18

Title XXI .........................................................................................................17, 18

**Legislative Materials**

Bankruptcy Reform Act of 1999: 106th Cong., 1st Sess.,
145 Cong. Rec. H 2655 ..............................................................................................25

Bankruptcy Reform Act of 1999: 106th Cong., 1st Sess., 145 Cong. Rec. S 14678 (Nov.
17, 1999).......................................................................................................................24

## Other Authorities

David Gray Carlson, *Means Testing: the Failed Bankruptcy Revolution of 2005*, 15
Am. Bankr. Inst. L. Rev. 223, 262-63, (Spring 2007) .................................................7

Henry J. Sommer, *Trying to Make Sense out of Nonsense: Representing Consumers
Under the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005"*,
79 Am. Bankr. L.J. 191, 195 (2005) .....................................................................7,8

N.C. Employment Sec. Comm., February 2009 Report on Monthly Activity.
(http://www.ncesc1.com/pmi/activityRpts/activitymain.asp)....................................12

North Carolina Office of the State Controller    Comprehensive Annual Financial
Report (CAFR) Fiscal  Year  Ended June 30, 2010 at Page 81 and page 132,
*available at*                   http://www.ncosc.net/financial/10CAFR/index.html. ...........13

U.S. Unemployment Insurance Trust Funds, Long-standing State Financing Policies
Have Increased Risk of Insolvency GAO 10-440. Washington, DC: General
Accounting Office, 2010. http://www.gao.gov (accessed June 4, 2011)...................11

United States Dept. of Labor, Trust Fund Loans,
http://workforcesecurity.doleta.gov/unemploy/budget.asp#tfloans) (accessed August
22, 2011)......................................................................................................................12

**Treatise**

2 COLLIER ON BANKRUPTCY 101.10A (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2007) ................................................................................................................. 7

NOW COME Willis A. Glanton and Kathy H. Glanton, the Appellants herein, by and through counsel undersigned, and respectfully submits this brief in which it requests that the Order of the United States Bankruptcy Court for the Middle District of North Carolina, entered on June 24, 2011 be reversed.

## STATEMENT OF ISSUE PRESENTED ON APPEAL AND STANDARD OF REVIEW

**A.      Issues Presented by Appellants on Appeal**

1.      Whether the Bankruptcy Court erred in finding that unemployment compensation benefits are not a benefit received under the Social Security Act.

2.      Whether the Bankruptcy Court erred in finding that unemployment compensation benefits, derived from federal advances received under Title XII of the Social Security Act are not a benefit received under the Social Security Act.

3.      Whether the Bankruptcy Court erred in finding that the Debtors' plan, by excluding unemployment benefits from a calculation of current monthly income, failed to comply with the disposable monthly income requirements of 1325(b)(1)(B).

4.      Whether the Bankruptcy Court erred in finding that the Debtors' plan, by excluding unemployment benefits from a calculation of current monthly income, failed to comply with the applicable commitment period requirements of 1325(b)(4).

**B.      Applicable Standard of Review**

The standard of review for matters appealed from the Bankruptcy Court to this Court is the application of a "clearly erroneous standard," for findings of fact. Safety-Kleen, Inc. v. Wyche, 274 F.3d 846, 859 (4th Cir. 2001).   Conclusions of law are reviewed *de novo*.   In re Varat Enter., Inc., 81 F.3d 1310, 1314 (4th Cir. 1996).   A bankruptcy court necessarily abuses its discretion if its decision is based on an erroneous view of the law or clearly erroneous factual findings.   In re Reinertson, 241 B.R. 451, 454 (Bankr. 9th Cir.BAP 1999), *citing* Cooter & Gell v. Hartmax Corp, 496 U.S. 384, 405 (1990).

## STATEMENT OF THE CASE

Willis and Kathy Glanton (hereinafter "the Glantons"), filed a Voluntary Petition under Chapter 13 of the United States Bankruptcy Code on December 29, 2010.  The Glantons filed all required bankruptcy schedules and forms, including Official Form B22C, or the "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income" (hereinafter "Form B22C").

On Form B22C, the Glantons included all income received by the female Debtor, but excluded unemployment compensation received by the male Debtor, instead listing the benefits at Line 8 of the Official Form B22C under the appropriate

2

heading: "Unemployment Compensation claimed to be a benefit under the Social Security Act".

Based on the exclusion of the unemployment benefits, the Glantons' "current monthly income" (hereinafter "CMI"), as defined by 11 U.S.C. § 101(10A)(A)(i), is $45,371.28, which is less than the state median annual income for a family of three in North Carolina. (*See* Form B22C, Bankruptcy Court Docket No. 1, at p. 57, lines 14-16). Because the Glantons' income is below the state median, their disposable income is not determined pursuant to 11 U.S.C. 1325(b)(3), but is instead determined by subtracting the Glantons' reasonably necessary expenses (as reflected on Schedule J, See Schedule J, Bankruptcy Court Docket No. 1, at p. 54-55) from their current monthly income. (*See* "Below Median Income Disposable Monthly Income Calculation", Bankruptcy Court Docket No. 1, at p. 36). Without including unemployment income, the Glantons have *negative* $1,212.01 in disposable monthly income.

Since the Glantons, by excluding unemployment compensation from CMI, are below the state median income, their "applicable commitment period," (hereinafter "ACP"), determined in accordance with 11 U.S.C. § 1325(b)(4)(A)(ii) is "not less than 3 years.". Accordingly, the Glantons proposed a Chapter 13 plan consisting of payments of $193.00 per month for the minimum applicable commitment period of 36 months. (See "Notice to Creditors and Proposed Chapter 13 Plan, Docket No. 12).

On February 14, 2011, the Chapter 13 Trustee filed an Objection to Confirmation of Plan (Bankruptcy Court Docket No. 14). The Trustee alleged that the Glantons had erred by excluding unemployment compensation from the CMI calculation, and that if such compensation were included, the Glantons would have current monthly income above the state median, thereby necessitating a 60 month applicable commitment period.

The parties submitted memoranda in support of their positions (Bankruptcy Court Docket Nos. 25 and 26), and a hearing was held in Durham, North Carolina on June 16, 2011. Present at the hearing were Koury L. Hicks (the Glantons' attorney), Benjamin E. Lovell (attorney for the Chapter 13 Trustee). The Honorable William L. Stocks, United States Bankruptcy Judge, presided over the hearing.

On June 24, 2011, the bankruptcy court entered an Order Denying Confirmation of Plan (Bankruptcy Court Docket No 28). On July 7, 2011, the bankruptcy court issued a Memorandum/Opinion setting forth the court's findings and conclusions, determining that unemployment compensation is *not* a benefit received under the Social Security Act and further finding that the Glantons erred by excluding unemployment compensation from the CMI calculation (Bankruptcy Court Docket No. 32).

On July 6, 2011, undersigned, on behalf of the Glantons, filed a Notice of Appeal of the Bankruptcy Court's June 24, 2011 Order. On July 20, 2011,

undersigned filed Appellant's Statement of Record and Designation of Record on Appeal. On August 11, 2011, the Notice of Appeal and record were transmitted from the Bankruptcy Court to the United States District Court for the Middle District of North Carolina, and on the same day, the appeal was docketed

## STATEMENT OF THE FACTS

The Glantons are married and have a 15 year old daughter who lives in the home. (Schedule I, Bankruptcy Docket No. 1 at p. 52). They reside in Durham County, North Carolina (Voluntary Petition, Bankruptcy Docket No. 1 at p. 1), and have CMI, as reflected on the filed Form B22C, of $3,780.94 (Form B22C, Bankruptcy Docket No.1, p. 57 at line 20). The unemployment benefit amount has not been included in the calculation of the Glantons current monthly income ("CMI"). Instead, the Glantons have noted the monthly benefit amount at Line 8 of Form B22C under the option "unemployment compensation claimed to be a benefit under the Social Security Act". By excluding the unemployment income from CMI, the Glantons have annualized current monthly income of $45,371.28. (Form B22C, Bankruptcy Docket No.1, p. 57 at line 15). As of the date of the filing of the petition, the median household income in Durham County, North Carolina for a family of 3 was $54,573.00. (Form B22C, Bankruptcy Docket No.1, p. 57 at line 16). Based on the exclusion of unemployment income, the Glantons are "below-median" debtors, and

5

accordingly, they proposed a 36 month plan pursuant to 11 U.S.C. 1325(b)(4). (Notice to Creditors and Proposed Plan, Bankruptcy Docket # 12). 1f, however, unemployment income were to be included in the CMI calculation, the Glantons would have annualized current monthly income of $59,775.00, making them "above-median" debtors with a required commitment period of 60 months.

## ARGUMENT

I.   UNDER A PLAIN LANGUAGE READING OF THE STATUTE, UNEMPLOYMENT COMPENSATION SHOULD BE EXCLUDED FROM CMI BECAUSE IT FALLS SQUARELY WITHIN THE MEANING OF THE TERM "BENEFITS RECEIVED UNDER THE SOCIAL SECURITY ACT".

The interpretation of the Bankruptcy Code starts "where all such inquiries must begin: with the language of the statute itself." Ransom v. FIA Card Servs. N.A., 131 S. Ct. 716, 723-24, 178 L. Ed 2d 603 (2011)(citing United States v. Ron Pair Enters., Inc. 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L. Ed 290 (1989)). When the statute's language is plain, "the sole function of the courts is to enforce the statute according to its terms" where the disposition required by the text is not absurd. Ron Pair, 489 U.S. at 241. See also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1. It is with this principle of statutory construction in mind that we first look to the definition of current monthly income, defined at 11 U.S.C. §101(10A) as follows:

6

The term "current monthly income"-... (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), **but excludes benefits received under the Social Security Act**.... (emphasis added).   The question is thus whether unemployment benefits, established under the regulatory framework of the Social Security Act and funded almost exclusively under provisions of the Social Security Act, are a benefit received under the Social Security Act.

Of the handful of courts that have examined this issue, two have found that unemployment benefits are a benefit received under the Social Security Act, and therefore excludable from the CMI calculation.  See  In re Sorrell, 359 B.R. 167 (Bankr S.D. Ohio 2007) and In re Munger 370 B.R. 21 (Bankr D. Mass. 2007). Several commentators have also opined in favor of the Debtor on this issue. *See eg* 2 COLLIER ON BANKRUPTCY 101.10A (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2007) (noting that unemployment benefits are provided for in several Titles of the Social Security Act), David Gray Carlson, *Means Testing: the Failed Bankruptcy Revolution of 2005*, 15 Am. Bankr. Inst. L. Rev. 223, 262-63, (Spring 2007) (reviewing the Sorrell opinion in a favorable analysis), Henry J. Sommer, *Trying to Make Sense out of Nonsense: Representing Consumers Under the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005"*, 79 Am. Bankr. L.J. 191, 195

(2005) (noting that unemployment compensation benefits provided for under Titles III, XII, XIII and XV of the Social Security Act).

Other courts have concluded that unemployment benefits are not a benefit under the Social Security Act, and therefore should be included in CMI.  See In re Washington, 438 B.R. 348 (N.D. Ala. 2010), In re Baden, 396 B.R. 617 (Bankr M.D. Pa. 2008); In re Kucharz, 418 B.R. 635 (Bankr C.D. Ill. 2009); In re Overby, 2010 WL 3834647 (Bankr. W.D. Mo. 2010); In re Winkles, 2010 WL 2680895 (Bankr. S.D. Ill. 2010); In re Nance, 2010 WL 2079653 (Bankr S.D. Ind. 2010); and In re Rose, 2010 WL 2600591 (Bankr N.D. Ga. 2010).

There is no debate that the Debtor's unemployment compensation is a "benefit". See Washington, 438 B.R. 351 n.2.   Nor is there any question that the benefit has been "received" by the Debtor.  Rather, the question turns on whether the benefit is "under" the Social Security Act.  As the court noted in In re Kucharz, "the preposition 'under' is both the cause of and the key to unlock the mystery.  In the context of its usage in Section 101(10A)(B), 'under' means 'required by' or 'in accordance with'. In re Kucharz, 418 B.R. 635 at 641 (citing Webster's Third New International of the English Language Unabridged (1976)).  The many provisions of the Social Security Act dictate not only how the states must administer their unemployment benefit programs, but also provides for the *funds* which are now being used by most states to fund their depleted unemployment trust funds. Accordingly, this

8

court must find, on a purely textual review, that the benefits received by Mr. Glanton in this case were received *under* provisions of the Social Security Act, and should therefore be excluded from the CMI calculation.

### A.    Unemployment compensation benefits are specifically provided for pursuant to multiple provisions of the Social Security Act.

Since its inception in 1935, the Social Security Act ("SSA") has had two major social insurance components: the Federal Old Age, Survivors, Disability and Hospital Insurance (OASDHI") program, including Title II and Title XVIII (Medicare) of the SSA, and the federal-state unemployment compensation program, Titles III, IX and XII of the Social Security Act.

The unemployment compensation provisions of the SSA, like many titles in the Act, outline a joint federal-state program. States are not required to enact unemployment compensation laws, but when they do, they must strictly comply with provisions of the SSA. See 42 U.S.C. § 503. For example, a state must pay unemployment compensation claims "when due," provide a fair and impartial hearing, and allow a claimant to deduct health insurance or income tax in accordance with a program approved by the Secretary of Labor. Further, a state must make periodic reports to the Secretary of Labor and make information available to the Secretary of Labor concerning individual claimants. Absent compliance with these specific requirements, federal funding must stop immediately. 42 U.S.C. § 503. "These

9

mandates are inextricably entwined with the Social Security Act" <u>In re Sorrell</u> 359

B.R. at 181.

The overall administration of state plans is funded by the SSA.  42 U.S.C. § 501

(2004). <u>See Cal. Dep't of Human Res. Dev. V. Java</u>, 402 U.S. 121, at 125 (1971).

Through this system, the federal government is able to "furnish federal money for the

administrative expenses of state unemployment compensation programs as an

inducement to the states to adopt programs that would achieve the larger objects [of

humane assistance and macroeconomic benefits]."  <u>Jenkins v. Bowling</u>, 691 F.2d 1225

(7th Cir. 1982).

In addition to the regulatory and administrative framework, Title XII of the

SSA provides direct funding for state unemployment insurance trust funds when the

state benefit account has been depleted.   Under the Title XII program, the Governor of

a state must apply for advances from the Federal Unemployment Account in

accordance with the procedure set forth in 42 U.S.C. § 1321 of the SSA.  The advances

received by the state may **<u>only</u>** be used for the payment of unemployment

compensation benefits.  The relevant provisions of Title XII of the SSA provide:

> "Advances shall be made to the States from the Federal
> unemployment account in the Unemployment Trust Fund as
> provided in this section, and shall be repayable, with interest
> to the extent provided in section 1202(b), in the manner
> provided in sections 901(d)(1), 903(b)(2), and 1202. **An
> advance to a State for the payment of compensation** in
> any 3-month period may be made if–

(A) the Governor of the State applies therefor no earlier than the first day of the month preceding the first month of such 3-month period, and
(B) he furnishes to the Secretary of Labor his estimate of the amount of an advance which will be required by the State **for the payment of compensation** in each month of such 3-month period."

42 U.S.C. § 1321(a)(1) (*emphasis added*).

The SSA further defines compensation as used in this subsection as "cash benefits payable to individuals with respect to their unemployment, exclusive of expenses of administration".  42 U.S.C. 1321(A)(3)(C).

In normal economic conditions, Title XII advances are not necessary to fund state unemployment insurance trust funds.  As the GAO notes, "the (unemployment insurance) program was designed to be forward funded and self-financed by states, with each state trust fund building up reserves from employer taxes during periods of economic expansion in order to pay UI benefits during economic downturns."  U.S. General Accounting Office. U.S. Unemployment Insurance Trust Funds, Long-standing State Financing Policies Have Increased Risk of Insolvency GAO 10-440. Washington, DC: General Accounting Office, 2010. http://www.gao.gov (accessed June 4, 2011).  However, in the current recession, states have become increasingly dependent on Title XII advances to meet existing unemployment benefit obligations. As of June 8, 2011, there were 30 states with outstanding Title XII loans totaling $40,723,505,102.17.  Of these 30 states, North Carolina ranked 6th in total Title XII advances, with current outstanding loans of $2,393,623,874.12.  See United States

11

Dept. of Labor, Trust Fund Loans,

http://workforcesecurity.doleta.gov/unemploy/budget.asp#tfloans) (accessed August

22, 2011).

**B.     North Carolina unemployment compensation benefits paid from May 2010 through July of 2011 are directly attributable to funds received by the state under Title XII of the Social Security Act.**

The North Carolina unemployment insurance fund has been insolvent since

February of 2009.  N.C. Employment Sec. Comm., February 2009 Report on Monthly

Activity.  (http://www.ncesc1.com/pmi/activityRpts/activitymain.asp)[1].  In early 2009,

in anticipation of the shortfall, North Carolina received its first Title XII advance of

$114 million dollars. Id.  Since February of 2009, the state of North Carolina has

continued to take Title XII draws from the Federal Unemployment Account to pay the

ongoing unemployment benefits which it can no longer afford.  As a result, the North

Carolina unemployment insurance trust fund, from which benefit payments are made,

is operating at a $2,393,623,874.12 deficit, while owing outstanding loans under Title

XII loans of over $2.6 billion dollars.  In December 8, 2010, the North Carolina Office

of the State Controller commented on the use of these advances:

---

[1]For the court's convenience, the Employment Security Commission monthly activity reports for February 2009 through July 2011 are attached as Exhibit A.

12

"During fiscal year 2010, the State received regular repayable advances from the Federal Unemployment Account (FUA) in the amount of $2.29 billion to continue financing the operating deficit in the State's unemployment compensation fund. Proceeds from the advances were used to pay state unemployment benefits.  Currently, the repayable advances are payable solely from the unemployment tax contributions and these contributions will be used specifically for paying down the debt until it is settled.   Meanwhile, the state unemployment benefits will continue to be paid from the repayable advances."

North Carolina Office of the State Controller Comprehensive Annual Financial Report (CAFR) Fiscal Year   Ended June 30, 2010 at Page 81 and page 132, *available at* http://www.ncosc.net/financial/10CAFR/index.html. (Cited pages of the report are attached as "Éxhibit B").

This is in direct contrast to the facts described in In re Kucharz and In re Winkles, both cases in which the court found an insufficient link between the Social Security Act and state unemployment compensation programs.  An essential factor to the Kucharz and Winkles holdings was the fact that the actual benefit payments were being paid entirely *by the state from state funds*.  "To the extent that extended benefits may, from time to time, be required by federal law, and paid, in part, with federal funds, they are required by the EUCA and by stand-alone bills that are passed in times of high unemployment, not by the SSA or any amendments to the SSA.  Thus a purely textual analysis favors the conclusion that unemployment benefits are not received

under the SSA." <u>Kucharz</u>, 396 B.R. at 641.  <u>See also id.</u> at 639 (discussing the surplus balance in the Illinois Unemployment Trust Fund as of June 30, 2008)[2].

In contrast to the financially solvent unemployment trust funds described in <u>Kucharz</u>, and <u>Winkles</u>, North Carolina is unable to fund its own unemployment trust fund and must, pursuant to Title XII of the SSA, routinely apply for fund advances under the SSA *and use the funds received as specifically directed under the SSA.*   The SSA mandate certainly makes the benefits received by Mr. Glanton more than merely "related" to the SSA.  The benefits received pursuant to Title XII of the SSA in fact <u>must</u> be used to pay unemployed individuals like Mr. Glanton.  For this reason, the court must find, under the plain language of 101(10A)(B), that unemployment benefits received by the Debtor are a "benefit received under the Social Security Act".

**C.**      **While the State of North Carolina maintains administrative control of its unemployment compensation system, this does not mean the benefits received are removed from "the Social Security Act"**

The Bankruptcy Court's analysis of the federal-state cooperative nature of the North Carolina unemployment compensation system ultimately finds that because North Carolina maintains administrative control over the day-to-day functions of the program, benefits disbursed by the State are not received under the Social Security Act.  This analysis mirrors the <u>Baden</u> court reasoning, which held that the extent of

_____

[2] As of June 7, 2011, Illinois has a total outstanding Title XII advance balance of $1,829,168,782.10.

state involvement in a benefits program determines whether the recipient derives the benefits *under* the SSA. Baden, 396 B.R. at 621. However, the logical end to this reasoning is that only benefits paid directly by the Social Security Administration under programs administered by the Social Security Administration would be deemed "benefits received under the Social Security Act," while other benefits received through a state program administered under the SSA would not.

Both the Sorrell court and the Munger court found that there was a sufficient nexus between the state unemployment scheme and the federal statutory requirements to find that benefits paid by the state are a "benefit received under the Social Security Act: As the Sorrell court reasoned:

> A component of this analysis is a brief understanding of unemployment compensation law, which involves both state and federal law, specifically the Social Security Act. States may, but are not required, to enact unemployment compensation laws. If, however, a state does enact an unemployment compensation law, it is required to comply with a series of federal mandates. See 42 U.S.C. section 1321 (Eligibility requirements for transfer of funds; reimbursement by State; application; certification; limitation). These mandates are inextricably entwined with the Social Security Act. For example, the Secretary of Labor must certify each state's compliance with the Social Security Act. To the extent a state law is not in compliance with the Social Security Act, it would be invalid under the Supremacy Clause of the United States Constitution.

15

*Sorrell.* 359 B.R. at 181 (citations omitted). Where unemployment benefits have the same underlying purpose as other provisions of the Social Security Act—that of maintaining "the recipient at subsistence levels," during a time of financial exigency— the *Sorrell* court found no logical basis for distinguishing between unemployment compensation benefits and other benefits under the Social Security Act. *Id.* at 182 (quoting *Java*, 402 U.S. at 131-32). The court then found that "the plain meaning of the words in section 101(10A)(B) contain no distinction between federal and state benefits administration. The applicable text does not speak of 'payment,' direct, indirect, or otherwise, but instead contains the unambiguously broader term 'benefits.'" 359 B.R. at 181.

The court in <u>Munger</u> agreed, finding that "benefits" as used in section 101(10A)(B) is a more inclusive word than "payments" and that Congress chose to exclude from CMI benefits received by virtue of the Social Security Act rather than the more narrow reading of "payments" made directly from the federal coffers with no state administration. There, the court found that "[t]he word 'benefit' does not draw a distinction between unemployment compensation and other benefits," and that Congress did not intend to exclude unemployment compensation from "benefits received under the Social Security Act." 370 B.R. at 23.

The overall construct of the SSA fully supports the conclusion reached by the courts in <u>Sorrell</u> and <u>Munger</u>- that is, the extent of State involvement in the program does not transform the benefit to one *not* received under the Social Security Act. The

16

broad scope of the SSA includes many programs that, like the unemployment compensation program, states administer through grants from the federal government and that operate with substantial oversight by the Secretary of Labor. For example, the SSA's federal/state programs include Title I – Grants to States for Old-Age Assistance; Title III– Grants to States for Unemployment Compensation Administration; Title IV – Grants to States for Aid and Services to Needy Families with Children and for Child-Welfare Services; Title V – Maternal and Child Health Services Block Grant; Title X – Grants to States for Aid to Blind; Title XIV – Grants to States for Aid to Permanently and Totally Disabled; Title XIX – Grants to States for Medical Assistance Programs; Title XX – Block Grants to States for Social Services; and finally, Title XXI – State Children's Health Insurance Program.

The federally administered and funded programs include: Title II – Federal Old-Age, Survivors, and Disability Insurance Benefits (OASDI); Title VIII – Special Benefits for Certain World War II Veterans; Title XVI– Supplemental Security Income for Aged, Blind, and Disabled (SSI); Title XVIII – Health Insurance for Aged and Disabled (Medicare).

Even OASDI, Medicare and SSI, though primarily federal programs, have some state involvement in their operations. OASDI provides for state agencies to make the determination as to whether a claimant is disabled. 42 U.S.C. § 421(a)(1). SSI contemplates coordinated federal-state payments to recipients as well as funding to the states for their complementary programs through Title XIX of the Act. The Medicare

program likewise includes a state component with sections 1395z and 1395aa of that Title providing for the Secretary of Labor to consult with State agencies for determination of conditions of participation by providers of services under the Medicare program.

By holding that only those programs that are funded and administered without state involvement are "benefits received under the Social Security Act," the Bankruptcy Court would require petitioners under Chapter 7 and Chapter 13 to include in CMI all benefits except those benefits received under Titles II (OASDI), XVI (SSI) and XVIII (Medicare). Debtors would have to include in CMI calculations all benefits received under the programs involving grants to the states, such as: Titles I (old-age assistance), III (unemployment compensation), IV (child welfare), V (maternal and child health services), X (aid to the blind), XIV (disability), XIX (medical assistance), XX (social services) or XXI (children's health insurance).

This reasoning would ultimately contort the statutory language and purpose of section 101(10A)(B) by confining the congressional reference to "the Social Security Act" to only those benefits received under three of eleven Titles of that Act. This Court should not allow such a constrained construction when the plain language of 101(10A)(B) makes no such distinction .

## II. THERE IS NO INHERENT AMBIGUITY IN THE LANGUAGE OF 11 U.S.C 101(10A)(B), BUT EVEN IF THERE IS AMBIGUITY, THERE IS NOTHING TO SUPPORT THE POSITION THAT CONGRESS INTENDED FOR UNEMPLOYMENT COMPENSATION TO BE INCLUDED IN A CALCULATION OF CMI.

The Bankruptcy Court cites In re Baden in support of its suggestion that "[t]he exclusion of unemployment compensation from the calculation of CMI is incongruous" with the goals of preventing abuse of bankruptcy by those with ability to pay and protecting education and retirement savings from creditors.  In re Baden, 396 B.R. at 622.

This argument was rejected by the courts in Sorrell and Munger.  The court in Sorrell specifically warned against placing too much emphasis on the oft-cited concept, "Those who can pay, should pay," noting that Congress itself did not strictly follow this principle, excluding certain sources of income, such as 401(k) contributions, repayment of 401(k) loans, and funds devoted to charitable organizations, from consideration of the debtor's ability to pay.  Sorrell, 359 B.R. at 178.

Additionally, while certainly one legislative objective of BAPCPA was to stop abuse of Chapter 7 bankruptcy, this was not the only policy behind the passage of BAPCPA.   Nor does it override the "fresh start" principle that has remained the foundation of the Bankruptcy Code for over one hundred years.  See Local Loan Co. V. Hunt, 292 U.S. 234, 244 (1934); Williams v. U.S. Fidelity & Guar. Co., 236 U.S. 549, 555 (1915).  Furthermore, the exclusion of all benefits received under the Social Security Act is entirely consistent with the purpose of both Social Security Act and the Bankruptcy Code, which together serve to protect the most vulnerable of citizens when they are unexpectedly and through no fault of their own, unable to meet their most basic obligations.  The Supreme Court, in addressing the overall purpose of the Social Security Act, commented:

> "The purpose of the (Social Security) Act was to give prompt if only partial replacement of wages to the unemployed, to enable workers "to tide themselves over, until they get back to their old work or find other employment, without having to resort to relief. California Dept. Of Human Resources Development v. Java, 402 U.S. 121, 131-32. (1971).

**A.**   **The statutory construction of § 101(10A)(B) read in conjunction with other relevant provisions of BAPCPA supports the conclusion that Congress intended to exclude unemployment compensation from CMI.**

The Trustee argues that because Congress has distinguished between unemployment benefits and social security benefits in other parts of the Bankruptcy Code, Congress must have intended to treat unemployment benefits differently than

those benefits which "people ordinarily think of (as) Social Security benefits". <u>See also In re Rose</u>, 2010 WL 2600591 (Bankr. N.D. Ga. 2010). However, it is just as likely that Congress intended to use a more expansive definition at §101 (10)(A)(B) to exclude *all* benefits received under the Social Security Act, including unemployment compensation benefits.

The <u>Sorrell</u> opinion is instructive on this issue, examining other areas of the 2005 Act which contain references specific provisions of the Social Security Act. The court compared section 11 U.S.C. § 362(b)(2) (automatic stay exceptions for child support obligations under § 466 of the SSA), 11 U.S.C. 704(c)(1)(A)(I) (duties of the Trustee with respect to state child support agencies created under the SSA), the broad language contained §101 (10A)(A)(B). The court notes that §101(10A)(A)(B) contains the *only* reference to the broader phrase "Social Security Act". In analyzing these provisions, Judge Waldron commented:

> In all of these examples, Congress did not choose the broad term the "Social Security Act," which is the language chosen in connection with CMI; but rather, selected specific provisions of the Social Security Act. The CMI definition does not contain any congressionally limited specific provisions of the Social Security Act. It is appropriate to conclude that when Congress wished to limit the applicability of the Social Security Act, it did so by reference to specific sections. Canons of statutory construction approved by the Supreme Court recognize that congressional enactments which contain particular language in one section of a statute, but omit such particularity in another section, reflect Congress's intention and

purpose in such disparate use. <u>BFP v. Resolution Trust Corp</u>, 511 U.S. 531, 537, 114 S.Ct.. 1757, 1761, 128 L. Ed. 2d 556 (1994), citing <u>City of Chicago v. EDF</u>, 511 U.S. 328, 338, 114 S. Ct. 1588, 1593, 128 L. Ed. 2d 302 (1994). See also <u>Keene Corp.v. United States</u>, 508 U.S. 200, 208, 113 S.Ct. 2035, 2040, 124 L. Ed. 2d 118 (1993).

<u>In re Sorrell</u>, 359 B.R. at 183.

The court in <u>Munger</u> adopted the <u>Sorrell</u> reasoning on this issue, finding that based on "canons of statutory construction", unemployment compensation does constitute a "benefit received under the Social Security Act", and is therefore property excluded from CMI.  Following <u>Sorrell</u>, the court noted that when Congress intended to distinguish specific social security provisions, it did so expressly, citing 11 U.S.C. 522(d)(10), which allows the Debtor to claim certain property as exempt, relevantly:

(A)         a social security benefit, unemployment compensation, or a local public assistance benefit

(B)         a veterans' benefit;

(C)         a disability, illness, or unemployment benefit.

It follows, the <u>Munger</u> court held, that Congress' choice in wording these references "supports the view that 'a benefit received under the Social Security Act' in § 101(10A)(B) was purposefully intended to be broader than 'a social security benefit.'  'Unemployment compensation' is included in this broader definition.". <u>Munger</u>, 370 B.R. at 25.

Where <u>Munger</u> relied on Congress' choice of wording in the Bankruptcy Code as evidence that Congress knew how to distinguish between specific benefits when it intended to do so, the <u>Baden</u> court inexplicably cites this as evidence that Congress intended to exclude unemployment compensation from the definition of "social security benefits" Unfortunately, this conclusion disregards a basic principle of statutory construction, that *differing language* in two provisions of an Act should be given *different meanings*. See <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983). Congress clearly understood how to restrict particular forms of income, and more specifically, how to reference discrete provisions of the Social Security Act. Had it intended to limit the term "Social Security Act" (by referencing specific social security benefits), Congress could have easily done so.

**B.      Congress did not need to explicitly exclude the narrower category of unemployment benefits because unemployment benefits were not included in the pre-BAPCPA determination of disposable monthly income.**

The Bankruptcy Court cites <u>Baden</u> (citing a number of pre-BAPCPA cases) in support of its statement that "a traditional rule of construction is that statutes should be read to deviate from prior practice only when done so with specificity'. However, the pre-BAPCPA cases cited by the <u>Baden</u> court only address whether unemployment income may be considered for Chapter 13 eligibility, specifically whether a Debtor with unemployment income can be an "individual with regular income", as 11 U.S.C. 109(e) requires. These cases do not stand for the point that unemployment income should be used to determine *the amount of repayment to creditors.* See <u>Baden</u> at 396

B.R. at 623. See also In re Hickman 104 B.R. 374, 377 (Bankr.D.Colo.1989) ; In re Compton, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988); In re Overstreet, 23 B.R. 712, 713-715 (Bankr.W.D.La.1982).  As such, there was no "established application of judicial interpretation" regarding unemployment compensation for Congress to explicitly overturn.  Accordingly, Congress chose to exclude the broader category of "benefits received under the Social Security Act".

> **C.      The legislative history supports a finding that Congress, in choosing the exclusions under 101(10A)(B), desired to protect unemployment benefits from the determination of CMI.**

 Both the Senate and the House of Representatives considered proposals in 1999 to exclude "benefits received under the Social Security Act" from the definition of CMI.   Upon introduction of the amendment, Senator Edward Kennedy noted the many financial hardship encountered by older Americans, specifically including the loss of employment and inability to find suitable employment among those difficulties. Bankruptcy Reform Act of 1999: 106th Cong., 1st Sess., 145 Cong. Rec. S 14678 (Nov. 17, 1999) ("in too many circumstances in our country today, the elderly are discriminated against in terms of employment) (statement of Sen. Kennedy).  The amendment passed.

The House of Representatives expressed similar concerns.  Representative Conyers moved to recommit the bankruptcy bill including the amendment commenting:

"As the law currently stands, any senior is eligible for bankruptcy relief. The bill, however, would force millions of seniors living on fixed incomes into mandatory repayment plans. This is because there is no exclusion from the definition of "income" for payments received for Social Security, retirement, for disability insurance, for supplemental security income, or for unemployment insurance."

Bankruptcy Reform Act of 1999: 106th Cong., 1st Sess., 145 Cong. Rec. H 2655, 2770 statement of Rep. John Conyers) (emphasis added). The Congressional record is clear that when Senator Kennedy and Representative Conyers proposed the amendment to exclude "benefits received under the Social Security Act", Congress was particularly concerned about the plight of unemployed seniors, and intended that the calculation of CMI should exclude all "benefits received under the Social Security Act", *inclusive* of unemployment benefits.

Thus, while the plain meaning of 101(10A)(B) requires the court to find that the phrase "benefits received under the Social Security Act" includes unemployment benefits received under the Social Security Act, the statutory interpretation urged here is also entirely consistent with the expressed legislative intent of Congress.

## CONCLUSION

For the foregoing reasons and rationale above, Appellant contends that the Bankruptcy Court erred by denying confirmation of the Debtor's Chapter 13 plan. Accordingly, Appellant respectfully requests that the Bankruptcy Court's Order be reversed and that the Glantons' Chapter 13 plan be confirmed as originally proposed.

25

Respectfully submitted this 25th day of August, 2011.

LAW OFFICES OF JOHN T. ORCUTT, P.C.

/s/ Koury L. Hicks

Koury L. Hicks
Attorney for the Debtors
North Carolina State Bar No.:  36204
1738 Hillandale Rd.
Durham, N.C.  27705
(919) 286-1695
khicks@johnorcutt.com

<u>CERTIFICATE OF SERVICE</u>

I, Koury L. Hicks, certify under penalty of perjury that I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age and that on August 25, 2011 , I served copies of the foregoing Brief of Appellants by electronic service and/or first class mail upon the following parties in interest:


Richard M. Hutson, II
Standing Chapter 13 Trustee


Benjamin E. Lovell
Attorney for the Chapter 13 Trustee


Michael West
U.S. Bankruptcy Administrator


Willis and Kathy Glanton
611 Beaver Dam Run,
Durham NC 27703


<u>/s/ Koury L. Hicks</u>

Koury L. Hicks
